

COMMONWEALTH OF VIRGINIA vs CHRISTOPHER GLENN WHITE
HEARING,   on 03/09/2022                                    Page 50

                                                            Page 50

```
 1   two.

 2        Q    The equivalent of two beers.

 3        A    Almost, yes.

 4        Q    I think you told the police that you saw

 5   Devon take a bar.

 6        A    Uh-huh.

 7        Q    What is a bar?

 8        A    It's a Xanax bar.

 9        Q    A Xanax bar?

10        A    Yes.

11        Q    And would she take that at the Cavalier,

12   or she take it at Rivermont Pizza, or where did you

13   see her take it at?

14        A    I can't -- I don't remember.

15        Q    But you definitely saw her take it?

16        A    Yes.

17        Q    And you knew that to be Xanax?

18        A    Yes, yes.  Because I know she has a

19   prescription for Xanax.  She has bad anxiety.

20        Q    Okay.  And it was just one bar or was it

21   more than that?  Was it the typical amount she takes

22   or do you know?

23        A    I'm not sure how much she usually takes,

24   but a bar.  I remember seeing her take a bar.  I

25   don't know if she took any more than that.
```

*B*

Page 17

```
 1        A     Yes.

 2        Q     Okay.  And you said it was one glass of

 3    wine?

 4        A     Yes, sir.

 5        Q     What kind of wine was it?

 6        A     It was a red wine.  I'm not really sure of

 7    the type.

 8        Q     And you said -- do they offer wine there

 9    at the --

10        A     Yes, sir.

11        Q     It was a full glass?  A half glass?

12        A     The glass was about this big (Indicating).

13    And there was probably about that much in there.

14    They don't give you a lot there.

15        Q     So you had a glass of wine at the --

16        A     Yes.

17        Q     You met with a forensic nurse examiner

18    later that -- the next morning, correct?

19        A     Yes, sir.

20        Q     And you told the forensic nurse examiner

21    that you were taking Seroquel, Wellbutrin, and

22    Alprazolam.

23        A     Yes, sir.

24        Q     Were you taking all of those medications

25    on the same day?  Did you take those medications
```

COMMONWEALTH OF VIRGINIA vs CHRISTOPHER GLENN WHITE
HEARING,   on 03/09/2022                                      Page 23

Page 23

```
 1    it?  Or --

 2         A    No.  I wouldn't say never do it.  It's

 3    just I never take that amount of doubles.  Sorry, I

 4    never take that many shots in one sitting, I guess

 5    you could say.

 6         Q    But you do drink shots of liquor?

 7         A    Not particularly.  I will have a White

 8    Claw or wine, mainly, or White Claw or wine mainly.

 9         Q    So it's rare that you take a shot of

10    liquor?

11         A    Yes, it is.

12         Q    Now, what about beer, is beer something

13    you drink quite often?

14         A    I wouldn't say often, but, yes, that is

15    something I do drink.

16         Q    On a nightly basis?

17         A    Not a nightly basis.  Maybe three or four

18    times a week.

19         Q    And how many beers would you consume?

20         A    One or two, maybe.  Maybe two.

21         Q    One to two beers three or four times a

22    week?

23         A    Yeah.  I would say yes.

24         Q    And the shots, like one shot a month?

25         A    I wouldn't be -- I don't know.
```



6/7/22, 5:41 PM                          Virginia Courts Case Information System

| Name List | Pleadings/Orders | Services | Main Menu | Logoff |

## Lynchburg Circuit - Civil Division
### Case Details

| | |
|---|---|
| **Case Number:**<br>CL20000353-00 | **Filed:**<br>04/15/20 |
| **Filing Type:**<br>Name Change | **Filing Fee Paid**<br>Yes |
| **Number of Plaintiffs:**<br>0002 | **Number of Defendants:**<br>0001 |
| **Commenced By:**<br>Initial Filing | |
| **Bond:** | **Complex Case:** |

If there are more than three plaintiffs or defendants as indicated under "Number of Plaintiffs" or "Number of Defendants" in the table above, please contact the court for the additional party information.

**Plaintiffs**

    Plaintiff 1:   **MAHER, ALLISON MARIE**
    Trading as:
    Attorney:    PRO SE

    Plaintiff 2:   **SMITH, MARIE**
    Trading as:
    Attorney:    PRO SE

**Defendants**

    Defendant:   **NAME CHANGE**
    Trading as:
    Attorney:    PRO SE

**Hearings**

| # | Date | Time | Type | Room | Duration | Jury | Result |
|---|------|------|------|------|----------|------|--------|
| | | | | | | | |

Virginia Courts Case Information System

| 1 | 04/17/20 | 9:00AM | Present Decree And/Or Order | | | | Granted |

**Date Ordered To Mediation:**

**Final Disposition**

- **Judgment:**        Other
- **Final Order Date:**   04/17/20
- **Appealed Date:**
- **Concluded By:**      Other

[ Name List ]   [ Pleadings/Orders ]   [ Services ]   [ Main Menu ]   [ Logoff ]

Build #: 3.9.0.1

E1

5/30/22, 10:00 PM                                    IMG-0014.jpg



**+1 (434) 841-7946** >

iMessage
Tue, Dec 21, 3:28 PM

I'm finishing up my lesson with a student now. May I come get your summons now? Be there in the next 30 min?

I've had to leave the office. I don't think the order is even at the building yet

I'll have to keep your time tomorrow

Ok

Who's the attorney?

There isn't one at this time

Ok

Delivered





```
 1              THE COURT:  Yes.
 2          (Whereupon, a voice mail was played.)
 3              MS. VAUGHAN:  I do have a screen shot
 4   with the times.
 5              THE COURT:  That will be fine, counsel.
 6              MS. VAUGHAN:  There's just an exhibit
 7   with the timestamp, Your Honor.
 8              THE COURT:  Respondent's 3.
 9              (Whereupon, Respondent's Exhibit 3 was so
10   marked for identification and admitted, being a time
11   stamped record of a phone call.)
12   BY MS. VAUGHAN:
13          Q.    So, ma'am, basically your allegation
14   against my client is because you don't remember, he
15   must have raped you?
16          A.    I don't --
17              MS. VAUGHAN:  I'd ask her not to be
18   coached by the Commonwealth, Your Honor.
19              THE WITNESS:  I don't remember giving him
20   consent to have sex with me.  I don't remember giving
21   consent, telling him it was okay.
22   BY MS. VAUGHAN:
23          Q.    Ma'am, just because you don't
24   remember, does that mean that you didn't?
25          A.    Are you asking that it's okay what
```



# Complaint Form
## VIRGINIA STATE BAR



Email to **webintake@vsb.org**
or mail to
**VIRGINIA STATE BAR
INTAKE OFFICE**
1111 East Main Street, Suite 700
Richmond, Virginia 23219-0026
(804) 775-0570

NOTE: Send in this form if you have concerns about a lawyer's conduct. Your complaint might result in discipline to the lawyer. If you are seeking other remedies against the lawyer, you may need to seek legal advice from a lawyer in private practice. Also, the bar may require your further involvement in an investigation by asking you to be interviewed by a bar investigator and/or to participate in a hearing.
**Please DO NOT send original documents to the Virginia State Bar.** Preserve all original documents until your complaint has been resolved. In addition, please redact personally identifying information such as Social Security numbers, date of birth, driver's license numbers, etc. All documents will be destroyed in keeping with the bar's records and destruction policies.

**YOUR NAME:**
_ Mr.  _ Mrs.  _ Ms.
Christopher | G | White
*first* | *initial* | *last*

**YOUR ADDRESS:**
PO Box 246
*street*

Forest | VA | 24551
*city* | *state* | *zip code*

ChrisWhiteLawyer@gmail.c
*email (required)*

Daytime Telephone No.: (required)
☑ home (434 ) 660-9701
☐ work ( )
Other Telephone No. and times you can be reached:
☐ ( )
☐ ( )

**LAWYER'S NAME:**
Chelsea | | Webster
*first* | *initial* | *last*

**LAWYER'S ADDRESS:**
Lynchburg City Prosecuters Office
*lawyer's law firm, if known*
901 Court Street
*street address or P.O. Box*
Lynchburg | VA | 24504
*city* | *state* | *zip code*

Lawyer's Telephone No.:
( 434 ) 455-3760

**LAWYER'S ACTIONS COMPLAINED OF:**

Please note that the only reason this Bar Complaint was delayed is because of ongoing related proceedings. In an effort not to manipulate the tribunal I refrained from submitting this immediately after the conduct. Please see last page 3 of this bar complaint.

*(Continue on the back or a separate page if you need more space. Also, attach copies of any documents that help explain your complaint.)*

✓ I certify that all information on this complaint form is true and correct. I understand that the content of my complaint can be disclosed to the lawyer.

**YOUR SIGNATURE:** _____   DATE: _____

**FORM MUST BE SIGNED AND DATED**

Turn this form over for more information we need from you to analyze your complaint. ☛

Virginia State Bar Complaint Form . . . Page 2

**LAWYER'S ACTIONS COMPLAINED OF** *(continued)*

Please see last page 3 of this bar complaint.

**Continue on Separate Page**

**List the names, addresses, and phone numbers of persons who might be able to give additional information about your complaint:**

Lynchburg General District Court Honorable Judge Randy C. Krantz 905 Court Street, Lynchburg, VA

Stenosmart, Inc. 1402 Grandin Road, S.W., Suite 209 Roanoke, VA 24015 (540) 525-5085

**PLEASE ANSWER THE FOLLOWING QUESTIONS:**

1. Have you or a member of your family contacted us about this lawyer before?  ☐ yes  ☑ no
   If *yes*, please state when you made the complaint and the outcome of that complaint.

N/A

2. Have you filed a complaint or legal action about this matter anywhere else?  ☐ yes  ☑ no
   If *yes*, state where and the outcome. Seeking Counsel for Civil Action against all applicable parties.

3. Describe your relationship to the lawyer who is the subject of your complaint by choosing from the following:
   ☐ I am the lawyer's client
   ☐ I am the lawyer's former client
   ☐ I am a relative or friend of the lawyer's client
   ☑ I am an opposing party
   ☐ I am an opposing lawyer
   ☑ Other
   If Other, please explain: Protective Order Hearings are not represented by Prosecutors

4. What is the nature of your legal case? When was the lawyer employed or appointed to represent you? How much money, if any, was the lawyer paid to represent you? N/A

5. Is your concern only that you think the lawyer charged you too much?  ☐ yes  ☑ no
   If yes, you should contact the bar at (804) 775-9423 for information on fee dispute resolution.

6. Have you read the brochure describing the bar's attorney disciplinary process?  ☐ yes  ☑ no

Submit

Virginia State Bar Complaint Form . . . Page 3

**LAWYER'S ACTIONS COMPLAINED OF** *(continued)*

On January 4, 2022 during the protective order hearing, Attorney Chelsea Webster was telling the Witness Devon Key what to say. Attorney Webster was directly answering the questions and telling Devon Key what to say while Devon Key was under oath, sworn in, during her testimony, while she was testifying, in Court. This was while Devon Key was "on the stand"

Chelsea Webster was witness coaching Devon Key. During Devon Key's Testimony Chelsea Webster was sitting directly next to Devon Key, within one foot. Questions were posed to Devon Key by opposing counsel and after each question, before Devon Key would Answer, Chelsea Webster would tell Devon Key exactly what to say. This was all done while Devon Key was "on the stand."

This was witness coaching and in an effort to subvert the truth. Chelsea Webster was not telling Devon Key to testify to the truth, totally the opposite, Chelsea Webster was witness coaching Devon Key so that Devon Key would not tell the truth. Or, generally testify in an untruthful manner. Chelsea Webster's Conduct was unethical, underhanded and generally unprofessional.

Add to the forgoing the extremely serious nature of the entire proceedings and it becomes abundantly clear that Chelsea Webster sought to undermine the truth if only but for the purpose of unethical conduct that is a direct affront to the rules of professional conduct, rules of evidence and general decorm in the profession.

Witness Coaching is ethically prohibited and that was what Chelsea Webster was doing. The Judge also physically, through gesture, told Chelsea Webster to stop her conduct. After my attorney plead to the court to address Chelsea Websters unethical conduct.

Please see the attached transcript Page 28

*H1*

**Devon Key (Cross - Vaughan)**                    17

```
 1          A.      Him telling me, "Allison will never
 2   know if we had sex or not."
 3          Q.      Him telling you that Allison -- I'm
 4   sorry.  That he will never tell Allison?
 5          A.      "That Allison will never know.
 6   Allison will never know."  That's all I remember.
 7          Q.      That Allison will never know.  Where
 8   were the two of you when he was saying Allison will
 9   never know?
10          A.      I think -- I believe the living room.
11          Q.      In the living room in your apartment,
12   right?
13          A.      Yes, ma'am.
14          Q.      When you-all were leaving Rivermont,
15   before you went back to your apartment, you and your
16   friend went up and purchased growlers, like
17   to-go beers from the to-go shop from Rivermont?
18          A.      We didn't purchase those, no, ma'am.
19   We did not purchase those.  We -- I don't remember
20   purchasing anything.
21          Q.      So if we checked the footage, there
22   won't be any footage of you and your friend
23   purchasing to-go beer at Rivermont?
24          A.      No, I don't believe so.
25          Q.      When you-all got back to the
```

H2

COMMONWEALTH OF VIRGINIA vs CHRISTOPHER GLENN WHITE
HEARING,   on 03/09/2022                                              Page 67

Page 67

```
 1      Q     And who talked to you about he's the
 2   person who served everybody --
 3      A     At the --
 4      Q     -- at Rivermont Pizza.
 5      A     Correct.
 6      Q     And then also identified who had purchased
 7   the to-go beers at Rivermont Pizza.
 8      A     Correct.  To his recollection, yes.
 9      Q     Were you able to identify any bartender or
10   anybody waiting on them at the Cavalier at all?
11      A     No.  And they didn't have any cameras or
12   anything like that.
13      Q     So as far as the person that went to
14   Devon's apartment and took photographs, if any
15   evidence would have been collected, that would have
16   been Detective Heather Shumate?
17      A     Correct.
18      Q     Do you know, does she have a separate
19   report?
20      A     She is in -- she left very shortly after
21   this case to go to a longterm forensic school.  She
22   should be back at the end of this month.  And I'll
23   follow up with her in making sure we get all that
24   squared away.
25            MR. FELMLEE:  Okay.  Thank you.
```



COMMONWEALTH OF VIRGINIA vs CHRISTOPHER GLENN WHITE
HEARING,   on 03/09/2022

```
 1    jeans as far as they're not bell bottoms and you

 2    have to wear a belt to keep them up.  Are they

 3    pretty tight-fitting jeans?

 4        A    Yes.

 5        Q    They're very tight fitting, correct?

 6        A    I don't know what very tight fitting --

 7    what do you mean by tight fitting?

 8        Q    They're close to your leg and they're nice

 9    and snug jeans that you wear out to go out to the

10    bars at night, correct?

11        A    Yes.  But you can still pull them up and

12    have room.  I don't understand that comment.

13        Q    But you had jeans on?

14        A    Yes, I had jeans on.

15        Q    Okay.  When you woke up the next morning,

16    you said Alison was not there?

17        A    No.

18        Q    So you called Alison?

19        A    Yes.  I called Alison that morning.

20        Q    Do you know what time you would have

21    called Alison?

22        A    I usually get up around 8, so she was

23    already at work.  So probably around 8:30 a.m., I'm

24    going to guess.

25        Q    Around 8:30 is when you would have called
```

Maple Ridge Floor Plan - Two Bedroom_1.jpg (532×397)





## EXHIBIT "L"

**Exhibit "L"** is a voice recording of Plaintiff and DEVON KEY Speaking. Wherein DEVON KEY

provides Plaintiff with her phone number and asks to hangout again at a later date. This was at the

end of the night moments before Plaintiff went home.





## The Law Offices Of Christopher G. White, P.A.

RAPIST!!!!!! BUYERS BEWARE!!!!!!

I went out on a date with this guy. He added me on Linked in and I messaged him telling him I thought he was cute and he sent me his number. Fast forward, We went out to the Cav in lynchburg and I asked my girlfriend to come with me considering I have never met him before. He got us drinks and kept getting us drinks to the point where we were obliterated. He kept buying us shots. My girlfriend and I went back to her place where he asked if he could come along. He followed us back to her place and by that point I passed out. He then told my friend that I would never find out. (My girlfriend has terrible anxiety and is prescribed xanax) She took one earlier that night because she was feeling really bad and at the end of the night she was so obliterated that she could hardly talk. He completely took advantage of my friend while I was in the next room and raped her. He then proceeded to go into his car and get a Plan B and forced her to take it. I woke up and went to work and he texted me that he wanted to see me again and then later I get a call from my crying girlfriend about bits and pieces of what happened last night. BUYERS BEWARE!!!!!!! I WILL BE GOING TO THE POLICE!

Cancel          Post



N 2





**Full Name:** Christopher Glenn White
**Date:** 12/22/2021                          **Time:** 1:43 PM

**Personal Information**

**Arrest Age:** 33
**Gender:** Male
**City:** Lynchburg, Virginia 24503
**Height:** 5'11"
**Weight:** 200 lbs
**Hair Color:** Brown
**Eye Color:** Hazel

arrests.org

**See Christopher's Criminal Record**

Search For Christopher's
Arrest Records

| Name | State |
|------|-------|
| Christopher White | VA |

Get Report →

Sponsored Content

**Charges**

**#1 SEXUAL ASSAULT - Intercourse w/victim thru mental incapacity/helplessness**

Other Arrests



DAVID KRAVETS    SECURITY   AUG 2, 2011 1:52 PM

# Mug-Shot Industry Will Dig Up Your Past, Charge You to Bury It Again

A handful of entrepreneurs are making real money by publicly shaming people who've run afoul of Florida law. Florida.arrests.org, the biggest player, now hosts more than 4 million mugs. On the other side of the equation are firms like RemoveSlander, RemoveArrest.com and others that sometimes charge hundreds of dollars to get a mugshot removed.



Ex-con Rob Wiggen gets hate mail daily for running a website that hosts 4 million mug shots. Photo by James Branaman/Wired.com

PHILIP CABIBI, A 31-year-old applications administrator in Utah, sat at his computer one recent Sunday evening and performed one of the compulsive rituals of the Internet Age: the ego search. He typed his name into Google to take a quick survey of how the internet sees him, like a glance in the mirror.

There were two LinkedIn hits, three White Pages listings, a post he made last year to a Meetup forum for Italian-Americans in the Salt Lake City area. Then, coming in 10th place – barely crawling onto the first page of search results – was a disturbing item.

"Philip Cabibi Mugshot," read the title. The description was "Mug shot for Philip Cabibi booked into the Pinellas County jail."

When he clicked through, Cabibi was greeted with his mug shot and booking information from his 2007 drunk-driving arrest in Florida. It's an incident in Cabibi's life that he isn't proud of, and one that he didn't expect to find prominently listed in his search results four years later, for all the world to see.

The website was florida.arrests.org, a privately run enterprise that siphons booking photos out of county-sheriff databases throughout the Sunshine State, and posts them where Google's web crawlers can see them for the first time. Desperate to get off the site, Cabibi quickly found an apparent ally: RemoveSlander.com. "You are not a criminal," the website said reassuringly. "End this humiliating ordeal ... Bail out of Google. We can delete the mug-shot photo."

Cabibi paid RemoveSlander $399 by credit card, and within a day, the site had come through. His mug shot was gone from florida.arrests.org, and his Google results were clean.

"The RemoveSlander site was perfect. It seemed like it was just tailored to the mug-shot site," Cabibi said in a recent telephone interview from Orem, Utah. "I searched 'how to remove mug shots from florida.arrests.org,' and the site was the first result. And I paid."

>'Of course I'm not going to have my mug on my site.'

With that, Cabibi passed through one of the latest niche industries on the web: the mug-shot racket. Exploiting Florida's liberal public-records laws and Google's search algorithms, a handful of entrepreneurs are making real money by publicly shaming people who've run afoul of Florida law. Florida.arrests.org, the biggest player, now hosts more than 4 million mugs.

On the other side of the equation are firms like RemoveSlander, RemoveArrest.com and others that sometimes charge hundreds of dollars to get a mugshot removed. On the surface, the mug-shot sites and the reputation firms are mortal enemies. But behind the scenes, they have a symbiotic relationship that wrings cash out of the people exposed.

Florida.arrests.org is the brainchild of a computer-savvy Florida ex-con named Rob Wiggen. The 32-year-old served three years in federal prison for participating in a small-time credit-card-skimming operation (.pdf) out of a Mexican restaurant in Tallahassee.

When he got out of jail in 2007, he was looking for more legitimate opportunities. Last year he seized on the idea of repurposing the booking photos that Florida police departments are obliged to make public under the state's sunshine laws.

4/9/22, 9:31 AM                         Mug-Shot Industry Will Dig Up Your Past, Charge You to Bury It Again | WIRED

The front page of florida.mugshots.org

Getting the photos is not completely straightforward: There is no central government repository. Instead, the mugshots and booking details are available on about five dozen different searchable web databases run by local police and sheriff's departments. Wiggen said he wrote screen-scraping software to perform searches on 37 of the counties, crawling to get arrests stretching back years, and continuously polling the sites for new busts, which he scarfs down at a rate of 1,500 a day.



Robert Wiggen's 2005 mug shot. Courtesy Leon County Sheriff's Office

Visitors to his site can comment on the photos, or browse them by tags like "Celebrity," "Hotties," "Trannies," "Tatted up" and "WTF." Most of the photos are of adults, but children as young as 11 are also on display if they're accused of adult crimes.

Wiggen said he wasn't setting out to shame or embarrass anyone: From his point of view, he's getting free content, then monetizing it with Google AdSense banners hawking defense lawyers and bail bondsmen. But the end result is that mug shots that were once hidden behind police CGI search scripts now display in Google searches, often prominently.

Wiggen's own mug shot is noticeably absent from florida.arrests.org. "Of course I'm not going to have my mug on my site," he told Wired.com.

His year-old business has earned him enemies. Wiggen said he receives about 100 angry e-mails, and a few snail-mail letters, every day from people whose booking photos are displayed on his site. "Obviously, they're really nasty," he said of the messages. "I never thought I'd get this backlash from individuals. I just never imagined it."

Among his harshest public critics is the reputation-management company RemoveSlander.com. "Thousands of people are being criminalized by mug-shot websites that collect ad revenue at their expense!" snarls the company's promotional YouTube video, "How To Remove Florida Arrests.org."



"Even defendants whose cases were dismissed are finding their mugs hot on the internet," the company's website adds. "Every time someone clicks on your page to view your mug shots, sites like Florida Arrests earns a little more cash from Google.... We have perfected the art of fighting mug-shot websites."

For $399, RemoveSlander promises to take that fight to florida.arrests.org, and force Wiggen to remove a mug shot. RemoveSlander's owner, Tyronne Jacques – the author of *How to Fight Google and Win!* – said the removal fee pays for his crack legal team to deal with florida.arrests.org, and to force Google to get the URL removed from Google's search index.

Asked how he accomplishes that, Jacques told Wired.com it was "a trade secret." A recent press release from the company called the work "daunting."

"It can't happen by magic," he said in a telephone interview. "There are legal means that we use.... There is a tremendous amount of work to get the photos down."

Other sites offering the same service are also closed-mouthed about their methods. The site RemoveArrest.com often enjoys advertising right on Wiggen's site through Google's algorithm-driven AdSense program. Joe Ellis, the operator of RemoveArrest.com, said his method is "proprietary," but that he's used it to get "hundreds" of mugs removed at $129 each.

It turns out, though, removing mug shots from florida.arrest.org is not as labor-intensive or arcane a process as the reputation companies claim. The real trade secret is that Wiggen wants a small piece of the action.

Wiggen said he has provided RemoveSlander an URL for an automated takedown script on his site. A PayPal payment of just $9.95 will automatically purge a mug shot from the site. For an expedited removal from Google's index, which Wiggen's code performs through Google's Webmaster tools interface, the fee is $19.90. Wiggen said other removal sites also make use of that same URL, but he declined to name them.

RemoveSlander "presses a button and makes a payment, and my website handles it automatically," Wiggen said.

Wired.com tried the interface independently, and for $19.90 we removed the mugshot of a randomly chosen misdemeanor defendant, which disappeared from the site inside 10 minutes.

Wiggen said about 750 mugs have been removed from florida.arrests.org since he launched the site last year — some of them he took down himself in response to e-mail requests, but most were performed by reputation-management firms like RemoveSlander. He appears content to let those companies take the lion's share of the mug-shot removal profits.

The bulk of florida.arrests.org's income comes from advertising, not mug-shot removal fees, he said, declining to otherwise discuss his revenue. "I'm not getting rich," he said.

>'The business model seems to be to generate embarrassment and then remove the source of the embarrassment for a fee.'

The reputation companies, though, appear to be doing pretty well. Of the $399 that Cabibi paid to RemoveSlander, $19.90 would have wound up with the mug-shot site that exposed him in the first place, and $379.10 with the company that promised to "fight" for him. By its own count, RemoveSlander has removed more than 300 mug shots.

Wired.com asked RemoveSlander's Jacques if it's true he's paying $19.90 for his $399 service. That end of the business, he said, was handled by a partner, who was not available to be interviewed. Ellis, the owner of RemoveArrest.com, would neither confirm nor deny his use of the automated takedown tool.

None of this appears to be illegal, but it demonstrates an unintended consequence of state transparency laws — of which Florida's is among the nation's strongest.

"The business model seems to be to generate embarrassment and then remove the source of the embarrassment for a fee," said Steven Aftergood, director of the Project on Government Secrecy for the Federation of American Scientists, and one of the nation's leading open-records advocates.

"So the whole practice is designed to exploit human weakness," said Aftergood. "From an information policy point of view, it is also likely to have adverse consequences. People are more likely to say, 'Who needs it, let's seal all of these records.' That would be an unfortunate consequence."

The State of Florida is unapologetic about the market its mug-shot posts have enabled. "We are very public-record–friendly. We are one of the most transparent states out there," Kristi Gordon, a spokeswoman for the Florida Department of Law Enforcement, said. "As soon as a photo is taken at a booking facility, it becomes a public record."

Craig Rockenstein, assistant general counsel for the department, declined to discuss the matter. "I've been here 25 years, and that's the first time I was ever asked that," he said.

The sudden ubiquity of mug-shot websites has prompted David Haenel, a Florida criminal-defense attorney, to advise clients to surrender themselves to small town sheriff's departments where bookings are so infrequent that Wiggen and others won't bother scraping their web sites for fresh mug shots.

"I have them go to a county I know they are not scraping the data from," said Haenel, who practices in Sarasota, Florida.

If someone does wind up on florida.arrests.org, though, Haenel will get the photo removed for a $1,250 fee through his own website, hidemymugshot.com. Haenel said he has helped about 25 clients do that in the last two months. He said he doesn't know anything about the $19.90 removal script, and declined to describe how he gets the mug shots removed.

Now $399 poorer, Cabibi said he feels like he's been played.

He said his arrest came during a lapse in judgment, when he drove home intoxicated from a Florida bar after watching college football in 2007. His blood-alcohol was almost double the legal limit. He pleaded no contest, paid a fine and did six months' probation. The Adobe applications administrator thought his past was behind him.

"You know, I did make a mistake back then," he said. "There's a difference between having it available on the county jail website ... then to have it return on the first page in Google when you google your name. It seems like ... extortion to me."

**See Also:**

44. Computer Virus Leads to $20 Million Scam Targeting Pianist
45. Condé Nast Got Hooked in $8 Million Spear-Phishing Scam
46. Second Man Sentenced in Trojan Horse Bank Scam
47. New York Times Reforms Online Ad Sales After Malware Scam
48. Wisconsin Teen Gets 15 Years for Facebook Sex-Extortion Scam
49. Malware Threatens to Sue BitTorrent Downloaders
50. Costly Online Organ-Transplant Scam Results in Death, Arrest
51. Lifelock Dinged $12 Million for Deceptive Business Practices

David Kravets is a WIRED senior staff writer and founder of the fake news site TheYellowDailyNews.com. He's a dad of two boys and has been a reporter since the manual typewriter days. His PGP fingerprint is 066F 245D 22A0 7511 B36B CB4F 0F53 B742 5919 4A18.

SENIOR STAFF WRITER   🐦 🐦

TOPICS   FLORIDA   SUNSHINE AND SECRECY

Mug-Shot Industry Will Dig Up Your Past, Charge You to Bury It Again | WIRED